# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | | |
|---|---|---|
| SOUTHERN FIELD MAINTENANCE AND FABRICATION, LLC, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CIVIL ACTION NO. 2:18-CV-581-WC |
| WALTER ERIC KILLOUGH; and TOTAL MAINTENANCE SERVICES, LLC, | ) ) ) | |
| Defendants. | ) | |

## SECOND AMENDED COMPLAINT

Plaintiff Southern Field Maintenance and Fabrication, LLC ("Southern Field") states unto the Court the following for its second amended complaint against Defendants Walter Eric Killough, William Lomax Byrd, and Total Maintenance Services, LLC.

## Parties

1.     Southern Field is is an Alabama limited liability company with its principal place of business in Luverne, Crenshaw County, Alabama.

2.     Defendant Walter Eric Killough ("Killough") is a resident of Rutledge, Crenshaw County, Alabama.

3.     Defendant William Lomax Byrd ("Byrd") is a resident of Brantley, Crenshaw County, Alabama.

4.     Defendant Total Maintenance Services, LLC ("TMS") is an Alabama limited liability company with its principal place of business in Dothan, Houston County, Alabama.

## Nature of the Action

5.     This action arises, first, from Killough's actions taken in forming, incorporating, financing, creating a business plan for, and operating TMS while he was an employee of Southern Field. TMS's business plan included the taking of Southern Field's records, business, customers, and employees, and Killough executed on that plan while still in the employment of TMS. Killough took these actions surreptitiously and without the consent of Southern Field, and, because he held a position of trust with Southern Field, Killough took these actions in violation of Killough's fiduciary obligations and duties of loyalty he owed to Southern Field. Further, Killough's creation and operation of TMS involved the misappropriation and misuse of Southern Field's confidential and proprietary trade secret information. For a number of Killough's actions, Byrd, who was also a former employee, officer, and owner of Southern Field, advised, assisted, and acted in concert with Killough in violation of Byrd's non-compete agreement with Southern Field.

**Jurisdiction and Venue**

6.     The Court possesses subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1836(c), as it includes claims arising under the laws of the United States, more particularly claims under the Defend Trade Secrets Act, and 17 U.S.C. § 501(a), as it includes claims arising under the Copyright Act. The Court has supplemental subject matter jurisdiction over all other claims asserted herein pursuant to 28 U.S.C. § 1367(a).

7.     The Court possesses personal jurisdiction over Killough, Byrd, and TMS, who are residents of the State of Alabama.

8.     Venue is proper in this forum pursuant to 28 U.S.C. § 1391(b), in that all defendants reside in this judicial district, two defendants reside in this division of this judicial district, and a substantial part of the events giving rise to Southern Field's claims occurred in this judicial district and division.

**Facts**

9.     Southern Field is an industrial maintenance management and services provider that offers nationwide services in the pulp and paper, power generation, and cement industries and also supplies engineered products to provide reliable air pollution control equipment, industrial stoker boiler auxiliary equipment, air preheaters, and wood yard equipment. Southern Field has projects and operations in more than 30 states, including in Alabama and Georgia.

3

10.     Killough was, until March 25, 2018, an employee of Southern Field.

11.     Byrd was, until January 2018, an employee of Southern Field.

12.     TMS is an industrial maintenance company formed by Killough to compete with Southern Field. Upon information and belief, TMS is owned in whole or in part by Killough.

13.     Southern Field employed Killough commencing in approximately October 2007, and employed him until his separation from his employment with Southern Field on or about March 25, 2018.

14.     Killough began his employment with Southern Field as a fabrication shop foreman, and over time Killough was promoted by Southern Field to the position of superintendent. On the date of his separation from his employment with Southern Field, Killough was superintendent of Southern Field's maintenance and construction crew assigned to supervise and manage Southern Field's ongoing maintenance and construction service work for Georgia-Pacific Corporation at a Georgia-Pacific containerboard manufacturing facility in Cedar Springs, Georgia (the "GP Project").

15.     In the job of superintendent of Southern Field's maintenance and construction crew on the GP Project, Killough held a high-ranking position of trust and confidence with Southern Field.

4

16.    As a result of Killough's high-ranking position of trust and confidence with Southern Field, Southern Field shared with Killough profit and overhead information for Southern Field for jobs Killough was supervising for Southern Field on the GP Project in order to assist Killough and Southern Field analyze the profitability of those jobs and to help Killough prepare bids for future work by Southern Field of a similar nature.

17.    As a result of Killough's high-ranking position of trust and confidence with Southern Field, Southern Field shared with Killough its business plans to secure and expand its plant maintenance work, and Killough was told by Southern Field that it expected Killough to play an integral part in those plans as an employee of Southern Field. To this end, in February 2018, Killough was offered an opportunity to purchase an ownership interest Southern Field's parent company, which Killough declined on March 1, 2018.

18.    Southern Field invested heavily in training and educating Killough, including showing him a substantial amount of proprietary company financial and customer information, instructing and training him in the processes necessary to properly estimate construction and maintenance projects for Southern Field, and placing him in position to develop and strengthen Southern Field's relationship with Georgia-Pacific, from whom Southern Field generated a significant amount of business. As to the GP Project, Killough became the "face of the company" for

Southern Field with Georgia-Pacific, Southern Field's customer on the GP Project, and the customer's representatives involved in that project.

19.     At a time presently unknown to Southern Field, but not later than the August 2017, Killough began making plans and taking actions to form an industrial maintenance and construction company to compete with Southern Field. All of Killough's plans and actions to form this competing company were undertaken during a time when Killough was an employee of Southern Field, and they were undertaken clandestinely and without the knowledge or consent of Southern Field.

20.     The actions undertaken by Killough included the formation and incorporation of TMS; creating a business plan for TMS that involved taking Southern Field's ongoing maintenance and construction work on the GP Project; obtaining funding and financing for TMS; creating a company name and logo for TMS; obtaining credit accounts with a vendor for TMS; and obtaining insurance for the new company. All of these actions were undertaken in secret and while Killough was still employed by Southern Field.

21.     While still employed by Southern Field, Killough took additional steps to take, or attempt to take, business from Southern Field on behalf of TMS. These steps included:

> a.  no later than January 2018, taking steps to have TMS set up as a vendor at the Georgia-Pacific Cedar Springs facility;

b.  entering into a Master Purchase Agreement with Georgia-Pacific Cedar Springs on or about February 9, 2018;

c.  no later than February 2018, recruiting to TMS members of the Southern Field crew that he supervised on the GP Project to work for TMS on the GP Project;

d.  soliciting maintenance and construction jobs from Georgia-Pacific's buyers and managers on the GP Project that resulted in Georgia-Pacific Cedar Springs issuing purchase orders to TMS for maintenance work projects as early as March 1, 2018;

e.  having Georgia-Pacific replace Southern Field as the maintenance contractor on the GP Project outside of the usual bid process;

f.  having Southern Field removed from the bid list on the GP Project and/or failing to notify Southern Field about numerous upcoming bid opportunities on the GP Project; and

g.  using his Southern Field crew to work a maintenance job on the GP Project as TMS on or about March 16, 2018.

22.    The actions described above were undertaken clandestinely, without the knowledge or consent of Southern Field, and were done while Killough was still an employee of Southern Field.

23.     Additionally, Defendants Killough and TMS have misappropriated substantial amounts of confidential, proprietary and trade secret business information belonging to Southern Field for Defendants' use in forming, setting up, capitalizing and operating TMS.  Killough obtained this information by taking it from Southern Field's email system, by taking hard copy and/or electronic documents containing such information, and by virtue of the training and experience he was provided by Southern Field through his employment by Southern Field as a superintendent on the GP Project. The trade secret business information (the "Southern Field Trade Secrets") misappropriated by Defendants Killough and TMS includes:

a.   Southern Field's project estimates, proposals, and purchase order information,  along with Killough's intimate knowledge about Southern Field's proprietary and confidential information contained in them (the "Bid Documents"):

i.   Bid Documents contain trade secret data consisting of costs structure of internal labor, fringes, overhead, profit, historical data of past jobs and winning composite costs.

ii.   Killough prepared proposals and bid work for Southern Field on numerous occasions and had many conversations of a

confidential nature on how Southern Field's price was prepared for the proposals and bid work he prepared.

iii.  Access to the Bid Documents is controlled via a pre-approved list of Southern Field employees that have access to these documents.

iv.  The Bid Documents are either stored on Southern Field's access-limited, password-protected server, or as paper files in locked cabinets or in locked rooms.

v.  Southern Field discussed specifically with Killough Southern Field's need to maintain the confidentiality of the proprietary information contained in its Bid Documents.

vi.  Final proposals within the Bid Documents, including proposals Killough prepared and sent to Georgia-Pacific on the GP Project, are marked with the confidential/proprietary legend "COMPANY CONFIDENTIAL & PROPRIETARY INFORMATION."

vii.  Southern Field's Bid Documents derive independent economic value from not being generally known to or readily accessible by other persons who could obtain economic value from their disclosure or use because, at a minimum, they include

information, such as historical cost and bidding information developed by Southern Field using information not generally known in the field, that would allow persons knowledgeable in the field to identify and competitively bid for business opportunities against Southern Field.

viii. During the time prior to and after separating from his employment with Southern Field, Killough copied and misappropriated certain Southern Field Bid Documents without Southern Field's consent or authorization and has disclosed and used the information contained in those Bid Documents through TMS at a minimum in obtaining and performing the maintenance service work on the GP Project.

b. Information from Southern Field's project tracking log, containing information on past, current and future purchase orders on the GP Project (the "Project Tracking Log"):

i. The Project Tracking Log listed Southern Field's customers, locations and dollar amounts of all bids.

ii. Only authorized Southern Field personnel are given access to the Project Tracking Log.

iii.  The Project Tracking Log is maintained in an electronic format on Southern Field's access-limited, password-protected server.

iv.  Southern Field discussed specifically with Killough information from the Project Tracking Log concerning proposals and jobs related to the GP Project as well as Southern Field's need to maintain the confidentiality of the proprietary information contained in its Project Tracking Log.

v.  Southern Field's Project Tracking Log derives independent economic value from not being generally known to or readily accessible by other persons who could obtain economic value from its disclosure or use because, at a minimum, it includes information, such as customer and historical bid information developed by Southern Field using information not generally known in the field, that would allow persons knowledgeable in the field to identify and competitively bid for business opportunities against Southern Field.

vi.  During the time prior to separating from his employment with Southern Field, Killough misappropriated confidential and proprietary information contained in Southern Field's Project Tracking Log without Southern Field's consent or authorization

and, upon information and belief, has disclosed and used that information contained in the Project Tracking Log through TMS at a minimum in obtaining financing to allow TMS to begin operations and in performing the maintenance service work on the GP Project.

c. Southern Field's proprietary and confidential time and materials rate sheet for loaded rates used on the GP Project (the "GP Loaded Rate Sheet"), used by Southern Field to prepare bids and quotes for industrial maintenance contracts and jobs on the GP Project:

   i. Southern Field's Loaded Rate Sheet is maintained in both hard copy and electronic copy formats.

   ii. Electronic copies and hard copies of the Loaded Rate Sheet are maintained by Southern Field's Chief Financial Officer in locked cabinets or in locked offices in Southern Field's offices in Luverne, Alabama.

   iii. Hard copies of the Loaded Rate Sheet were distributed only to a limited number of authorized personnel involved in soliciting, preparing or reviewing proposals for work on the GP Project, including Killough. The proprietary rate and markup information contained in the Loaded Rate Sheet are included in Southern

Field's Bid Documents for the Georgia Pacific Project, including proposals Killough prepared and sent to Georgia-Pacific on the GP Project, that are marked with the confidential/proprietary legend "COMPANY CONFIDENTIAL & PROPRIETARY INFORMATION."

iv. Southern discussed specifically with Killough Southern Field's need to maintain the confidentiality of the proprietary information contained in its Loaded Rate Sheet.

v. Southern Field's Loaded Rate Sheet derives independent economic value from not being generally known to or readily accessible by other persons who could obtain economic value from its disclosure or use because, at a minimum, it includes information, such as time and materials rates developed by Southern Field using information not generally known in the field, that would allow persons knowledgeable in the field to competitively bid for business opportunities against Southern Field.

vi. During the time prior to and after separating from his employment with Southern Field, Killough copied and misappropriated Southern Field's Loaded Rate Sheet without

Southern Field's consent or authorization and, upon information and belief, has disclosed and used the information contained in the Loaded Rate Sheets through TMS at a minimum in obtaining and performing the maintenance service work on the GP Project.

24.     The trade secret information described above is related to services used in, or intended for use in, interstate commerce, including Southern Field's service maintenance projects in the states of Alabama, Georgia, and Louisiana, among others. Southern Field's computer and email systems are used in interstate commerce, including throughout its many projects in the states of Alabama, Georgia, and Louisiana, among others.

25.     While employed by Southern Field, Killough received, and signed a written acknowledgment that he had received, the Southern Field Office, Superintendent, Safety, and Field Service Engineering Employee Handbook, which provides, in relevant part:

> Given the nature of Southern Field's business, it is frequently necessary for Southern Field employees to have access to sensitive business information regarding Southern Field, its customers, and its prospective customers. This information is confidential and is the property of the Company. It should only be used in connection with the performance of the Employee's job duties and should not be discussed with other employees or with third parties outside the Company except where explicitly authorized by the Company. This policy applies to all records, documents, information, data and computer programs, patent, copyright or trademark matters concerning or relating to the business and affairs of Southern Field, its clients or prospective clients. Violation of this non-disclosure policy constitutes grounds for immediate

termination, and may subject the employee to further criminal and/or civil liability in accordance with applicable Federal or State laws.

26.     Furthermore, when performing estimating, proposal and bidding functions on the GP Project for Southern Field, Killough prepared and delivered to Georgia Pacific quotes and proposals for maintenance work, all of which were marked in the document that Killough himself prepared as "COMPANY CONFIDENTIAL & PROPRIETARY INFORMATION."

27.     The misappropriation of Southern Field's confidential, proprietary and trade secret business information was undertaken by Killough, aided and abetted by TMS, to enable the Killough to form and capitalize TMS and to enable TMS to be ready immediately to compete with Southern Field and to take business opportunities from Southern Field.  Much of the information misappropriated was current when Killough took it, and could easily be used to Southern Field's great competitive detriment in the hands of a competitor like TMS. The misappropriated information had and has significant economic value to Southern Field, could not and cannot be readily obtained or replicated by competitors such as Killough and TMS from other sources, and has been the subject of reasonable efforts by Southern Fields to protect its secrecy.

28.     Through the activities of Killough, Killough and TMS became the maintenance service contractor on the GP Project, work that Southern Field had held and performed until Sunday, March 25, 2018. Specifically, Killough and TMS began

work as the maintenance service contractor on the GP Project on or about Monday, March 26, 2018, immediately after Killough separated from his employment with Southern Field on Sunday, March 25, 2018.

29.   Killough's and TMS's work as the maintenance service contractor on the GP Project represented substantial revenue gained by Killough and TMS and lost to Southern Field.

30.   Defendants would not have been able to acquire such business had Killough not (a) competed with Southern Field, on behalf of TMS, while Killough was still employed at Southern Field; and (b) taken and utilized Southern Field's confidential, proprietary and trade secret business information as described above.

31.   A critical aspect of Southern Field's industrial maintenance business is the calculation of labor and material costs for maintenance projects. In furtherance of that, on or around December 2017 and January 2018, Southern Field employees created the Actual CWR for Job 30459.

32.   On June 28, 2019, Southern Field sought registration of the Actual CWR with the United States Copyright Office.

33.   On August 6, 2019, the United States Copyright Office denied Southern Field's registration for the Actual CWR.

34.   During his employment with Southern Field, Killough had access to the Actual CWR. During the time period of, at least December 2017 to March 2018,

Killough prepared bids and tracked labor costs and expenses for Southern Field for industrial maintenance and construction jobs on the GP Project, including Job 30459. As part of those duties, Killough had access to and was provided the Actual CWR.

36. Both prior to and following his separation from Southern Field and without authorization from Southern Field, Killough and TMS copied the Actual CWR or created a substantially similar cost work report for the preparation of bids for industrial maintenance and construction projects on behalf of TMS both at Georgia-Pacific Cedar Springs and the Georgia-Pacific facility in Pennington, Alabama.

36. Killough and Byrd have a close personal relationship which began decades ago when Byrd married Killough's sister.

37. Killough and Byrd also have a long-standing professional relationship, as Byrd has hired Killough as an employee at a number of businesses, including at the predecessor company that eventually became Southern Field.

38. Byrd was one of Killough's managers at Southern Field for years. As a result, and also as a result of Byrd's professional responsibilities with Southern Field for the GP Project, Byrd was intimately aware of the scope and nature of Killough's work for Southern Field on the GP Project.

39.    On or about May 1, 2015, as a part of the consideration for Byrd's continued employed as President of Southern Field, Byrd entered into an Amended and Restated Service and Noncompetition Agreement (the "Byrd Agreement"). The Byrd Agreement provides, in relevant part, the following:

> During the period commencing on the date of this Agreement and ending on the third (3rd) anniversary of the termination of Byrd's engagement with [Southern Field] for any reason (the "Restriction Period"), Byrd shall not, anywhere within the territory within which [Southern Field does] business, directly or indirectly invest in, own, manage, operate, finance, control, advise, render services to or guarantee the obligations of any individual … [or ] limited liability company … engaged in or planning to become engaged in any business that is in competition with the Business of [Southern Field.]

The Byrd Agreement further provides that:

> During the Restriction Period, Byrd shall not, directly or indirectly … solicit the business of any Person who is a customer of [Southern Field]; cause, induce or attempt to cause or induce any customer … of [Southern Field] to cease doing business with [Southern Field], to deal with any competitor of [Southern Field] or in any way interfere with its relationship with [Southern Field.]

40.    Byrd provided advice and assistance to Killough and TMS by taking at least the following acts:

   a. On or before November 2017, referring Killough to First National Bank of Dozier ("FNB Dozier"), where Byrd had an existing banking relationship, for the purpose of establishing a banking relationship between TMS and FNB Dozier;

b. In or before March 2018, traveling with Killough to FNB Dozier for the express purpose of providing a personal reference on behalf of Killough to FNB Dozier as a part of a line-of-credit loan application Killough had made at FNB Dozier of behalf of TMS;

c. On or about March 6, 2018, editing and modifying a spreadsheet describing TMS's assets and certain Southern Field project proposals that Killough then emailed on March 6, 2018 to FNB Dozier President Willie Smith in support of the line-of-credit loan application Killough had made at FNB Dozier of behalf of TMS. Also attached to this email were three Georgia-Pacific contracts that Georgia-Pacific Cedar Springs had issued to TMS on March 1, 2018;

d. In or about January 2018, paying off a promissory note Killough had at the Federal Land Bank in the amount of $55,000, during the same time that Killough was depositing thousands of dollars in TMS's operating account at FNB Dozier; and

e.  Contacting Summers Brown at Fan Technology & Air System Engineers, a competitor of Southern Field, to solicit Brown and his company to hire Killough and TMS for maintenance and construction projects.

41.     As a result of the actions of Defendants, Southern Field has been injured and damaged.

## Count I – Defend Trade Secrets Act – 18 U.S.C. § 1836 ("DTSA")

42.     Southern Field hereby repeats, realleges and reincorporates the allegations in paragraphs 1- 4.1

43.     As described in Paragraph 23 above, the Southern Field Trade Secrets represent valuable confidential and proprietary financial and business information possessed by Southern Field within various programs, reports, and other documents that are used by Southern Field in connection with the provision of its products and services in interstate U.S. commerce.

44.     As described in Paragraph 23 above, each of the Southern Field Trade Secrets derive independent economic value from not being generally known to or readily accessible by other persons who could obtain economic value from its disclosure or use.

45.     As described in Paragraphs 23, 25, and 26 above, Southern Field takes and has taken reasonable steps to keep the Southern Field Trade Secrets secret and confidential.

46.     During the time prior to and after separating from his employment with Southern Field, Killough copied and misappropriated the Southern Field Trade Secrets without Southern Field's consent or authorization and, upon information and

belief, has disclosed them and used them through TMS in obtaining and performing the maintenance service work on the GP Project.

47.    Killough knew and continues to know of his duty as a then-current and now-former Southern Field employee to maintain the secrecy of the Southern Field Trade Secrets.

48.    Defendants Killough and TMS knowingly, intentionally, maliciously and improperly acquired and disseminated the Southern Field Trade Secrets in breach of their duty to maintain their secrecy.

49.    Defendants Killough and TMS engaged in this conduct with willful, malicious, and improper motives and with reckless indifference to the rights of Southern Field.

50.    Upon information and belief, Defendants Killough and TMS misappropriated, used and disclosed the Southern Field Trade Secrets at a time when Defendants were actively working to supplant Southern Field as the maintenance service contractor on the GP Project.

51.    Upon information and belief, Defendants Killough and TMS used and continue to use the Southern Field Trade Secrets, while knowing or having reason to know that this confidential and proprietary information was derived from Killough who had used improper means to acquire it, or was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or was

derived from Killough who owed a duty to Southern Field to maintain its secrecy or limit its use.

52.     Southern Field has been damaged by this misappropriation, entitling it to recover compensatory damages and other statutory remedies and recourse contemplated by the DTSA.

WHEREFORE, Southern Field demands compensatory and punitive damages from Defendants Killough and TMS, according to proof at trial, injunctive relief prohibiting these Defendants' use and employment of the Southern Field Trade Secrets, attorneys' fees and costs, and all such other relief to which Southern Field may show itself entitled in the premises.

## Count II – Alabama Trade Secrets Act – Ala. Code. § 8-27-1, *et seq*. ("ATSA")

53.     Southern Field hereby repeats, realleges and reincorporates the allegations in paragraphs 1- 52.

54.     As described in Paragraph 23 above, the Southern Field Trade Secrets represent valuable confidential and proprietary financial and business information possessed by Southern Field within various programs, reports, and other documents that are used by Southern Field in connection with the provision of its products and services in interstate U.S. commerce.

55.     As described in Paragraph 23 above, each of the Southern Field Trade Secrets derive independent economic value from not being generally known to or readily accessible by other persons who could obtain economic value from its disclosure or use.

56.     As described in Paragraphs 23, 25, and 26 above, Southern Field takes and has taken reasonable steps to keep the Southern Field Trade Secrets secret and confidential.

57.     During the time prior to and after separating from his employment with Southern Field, Killough copied and misappropriated the Southern Field Trade Secrets without Southern Field's consent or authorization and, upon information and belief, has disclosed them and used them through TMS in obtaining and performing the maintenance service work on the GP Project.

58.     Killough knew and continues to know of his duty as a then-current and now-former Southern Field employee to maintain the secrecy of the Southern Field Trade Secrets.

59.     Defendants Killough and TMS knowingly, intentionally, maliciously and improperly acquired and disseminated the Southern Field Trade Secrets in breach of their duty to maintain their secrecy.

60.     Defendants Killough and TMS engaged in this conduct with willful, malicious, and improper motives and with reckless indifference to the rights of Southern Field.

61.     Upon information and belief, Defendants Killough and TMS misappropriated, used and disclosed the Southern Field Trade Secrets at a time when Defendants Killough and TMS were actively working to supplant Southern Field as the maintenance service contractor on the GP Project.

62.     Upon information and belief, Defendants Killough and TMS used and continue to use the Southern Field Trade Secrets, while knowing or having reason to know that this confidential proprietary information was derived from Killough who had used improper means to acquire it, or was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or was derived from Killough who owed a duty to Southern Field to maintain its secrecy or limit its use.

63.     Defendants' misappropriation, disclosure and use of the Southern Field Trade Secrets constitutes a breach of confidence reposed in Killough by Southern Field.

64.     Southern Field has been damaged by this misappropriation, entitling it to recover compensatory damages and other statutory remedies and recourse contemplated by the ATSA.

65.     As provided in Ala. Code. § 8-27-4(a), Southern Field seeks recovery from Defendants Killough and TMS of any profits and other benefits conferred on Defendants Killough and TMS by the misappropriation that are attributable to the misappropriation as well as Southern Field's actual damages suffered as a result of the misappropriation.

WHEREFORE, Southern Field demands compensatory and punitive damages from Defendants Killough and TMS, according to proof at trial, injunctive relief prohibiting these Defendants' use and employment of the Southern Field Trade Secrets, attorneys' fees and costs, and all such other relief to which Southern Field may show itself entitled in the premises.

## Count III –Breach of Fiduciary Duty and Duty of Loyalty

66.     Southern Field hereby repeats, realleges and reincorporates the allegations in paragraphs 1- 65.

67.     Killough occupied a position of trust and confidence with Southern Field.  Killough held a managerial and supervisory role at Southern Field, and, as a result, he was shown substantial amounts of Southern Field's confidential and proprietary company financial information by Southern Field.  He was directly responsible for making company sales on the GP Project, and in providing estimates,

bids, quotes, proposals, budgeting and billing on the GP Project. As a result, he stood in a fiduciary relationship to Southern Field.

68.     As a fiduciary, manager, supervisor and employee of Southern Field, Killough owed the following duties to Southern Field, among others:

    a.   to disclose fully any conflict between his own interests and the interests of Southern Field;

    b.   to disclose fully to Southern Field any information held by him that if withheld could damage Southern Field;

    c.   to not set up a competing enterprise while still employed by Southern Field;

    d.   to not compete with Southern Field while still employed by Southern Field;

    e.   to not usurp a business opportunity while still employed by Southern Field; and

    f.   to not, after his employment relationship with Southern Field was over, use information gained in confidence to profit at the expense of Southern Field.

69.     Through the activities described above, Killough has violated his fiduciary duties and duty of loyalty owed to Southern Field, proximately resulting in injury and monetary damage to Southern Field.

WHEREFORE, Southern Field demands compensatory and punitive damages from the Defendant Killough, according to proof at trial, attorneys' fees and costs, and all such other relief to which Southern Field may show itself entitled in the premises.

## Count IV – Civil Conspiracy: Breach of Fiduciary Duty and Duty of Loyalty

70.     Southern Field hereby repeats, realleges and reincorporates the allegations in paragraphs 1- 69.

71.     By virtue of his own employment with Southern Field, Byrd was intimately aware of Killough's position with Southern Field and the fact that Killough held a position of trust and confidence with Southern Field.

72.     Byrd and Killough reached an agreement that Byrd would assist and advise Killough in Killough's establishment of TMS as a competitor of Southern Field with knowledge both that such actions would put Killough in breach of the fiduciary duties and duty of loyalty that Killough owed Southern Field.

73.     Byrd acted in concert with Killough in assisting and advising Killough in Killough's establishment of TMS as a competitor of Southern Field as described herein in breach of the fiduciary duties and duty of loyalty that Killough owed Southern Field.

74.     Southern Field has suffered injury and loss as a result of the Byrd's actions taken in concert with Killough that resulted in the formation and operation of TMS in breach of the fiduciary duties and duty of loyalty that Killough owed Southern Field.

WHEREFORE, Southern Field demands compensatory and punitive damages from the Defendant Killough, according to proof at trial, attorneys' fees and costs, and all such other relief to which Southern Field may show itself entitled in the premises.

## Count V – Conversion

75.     Southern Field hereby repeats, realleges and reincorporates the allegations in paragraphs 1- 74.

76.     Defendants Killough and TMS have taken and used electronic versions of certain of Southern Field's Bid Documents, documents containing information from Southern Field's Project Tracking Log, and the Loaded Rate Sheet without authorization from Southern Field.

77.     Defendants' actions in taking  and using of these documents and things without authorization constitute improper and unlawful deprivation of or interference with Southern Field's personal property, and a wrongful exercise of dominion over that property in defiance of Southern Field's rights therein.

78.     Defendants' acts constitute conversion and have damaged Southern Field.

79.     Defendants' conversion was done willfully and with knowledge that it was in violation of Southern Field's rights, entitling Southern Field to punitive damages.

WHEREFORE, Southern Field demands compensatory and punitive damages from Defendants Killough and TMS, according to proof at trial, attorneys' fees and costs, and all such other relief to which Southern Field may show itself entitled in the premises.

## Count VI -- Civil Conspiracy: Conversion

80.     Southern Field hereby repeats, realleges and reincorporates the allegations in paragraphs 1- 79.

81.     Byrd and Killough reached an agreement that Byrd would assist and advising Killough in Killough's establishment of TMS as a competitor of Southern Field by editing and modifying a spreadsheet taken from Southern Field without authorization from Southern Field that contained information from Southern Field's Project Tracking Log.

82.     Byrd acted in concert with Killough in editing and modifying a spreadsheet taken from Southern Field without authorization from Southern Field

that contained information from Southern Field's Project Tracking Log that Killough then provided to FNB Dozier in support of a TMS loan application.

83.   Defendants' actions in taking  and using of these documents and things without authorization constitute improper and unlawful deprivation of or interference with Southern Field's personal property, and a wrongful exercise of dominion over that property in defiance of Southern Field's rights therein.

84.   Defendants' acts have damaged Southern Field.

85.   Defendants' actions were done willfully and with knowledge that they were taken in violation of Southern Field's rights, entitling Southern Field to punitive damages.

WHEREFORE, Southern Field demands compensatory and punitive damages from Defendants, according to proof at trial, attorneys' fees and costs, and all such other relief to which Southern Field may show itself entitled in the premises.

## Count VII – Tortious Interference with Contractual & Business Relations

86.   Southern Field hereby repeats, realleges and reincorporates the allegations in paragraphs 1- 85.

87.   Defendants Killough and TMS were aware of and had knowledge of Southern Field's contracts and business relationship with Georgia-Pacific on the GP Project.

88.     Defendants Killough and TMS intentionally interfered with Southern Field's contracts and business relationship with Georgia-Pacific on the GP Project.

89.     Killough was aware of the importance of the GP Project to Southern Field. Killough would have been responsible for communicating any upcoming bid opportunities regarding the GP Project to Southern Field. Killough was aware that Southern Field desired to continue its work as the maintenance contractor on the GP Project.

90.     Killough acted outside of the scope of his employment with Southern Field and with malice towards Southern Field when he, while still employed by Southern Field:

    a. Formed and incorporated TMS to be a competitor of Southern Field;

    b. Recruited members of the crew of Southern Field employees that he supervised on the GP Project to work for TMS on the GP Project;

    c. Set up TMS as a vendor at the Georgia-Pacific Cedar Springs facility;

    d. Entered into a Master Purchase Agreement with Georgia-Pacific Cedar Springs;

    e. Solicited maintenance and construction jobs from Georgia-Pacific's buyers and managers on the GP Project that resulted in Georgia-Pacific Cedar Springs issuing purchase orders to TMS for maintenance work projects as early as March 1, 2018;

f.  Had Georgia-Pacific replace Southern Field as the maintenance contractor on the GP Project outside of the usual bid process;

g.  Had Southern Field removed from the bid list on the GP Project and/or failed to notify Southern Field about upcoming bid opportunities on the GP Project; and

h.  Used the Southern Field crew that he supervised on the GP Project to work a maintenance job on the GP Project as TMS on or about March 16, 2018.

91.   Southern Field was damaged as a result of these Defendants' intentional interference with Southern Field's contracts and business relationship with Georgia-Pacific on the GP Project.

92.   Southern Field has suffered injury and loss as a result of these Defendants' interference.

WHEREFORE, Southern Field demands compensatory and punitive damages from Defendants Killough and TMS, according to proof at trial, attorneys' fees and costs, and all such other relief to which Southern Field may show itself entitled in the premises.

## <u>Count VIII – Copyright Infringement</u>

93.     Southern Field hereby repeats, realleges and reincorporates the allegations in paragraphs 1- 92.

94.     Defendants have violated the exclusive rights granted to Southern Field by the Copyright Act, 17 U.S.C. § 101 *et seq.*, by reproducing the Actual CWR.

95.     The Actual CWR is an original work of authorship fixed in a tangible medium of expression from which it can be perceived, reproduced, or otherwise communicated.

96.     The Actual CWR was created by one or more Southern Field employees in the course of their employment with Southern Field. Southern Field is the owner of the copyright in the Actual CWR.

97.     The statutory requirements of 17 U.S.C. § 411 have been met. On June 28, 2019, Southern Field submitted an application for registration for the Actual CWR with the United States Copyright Office. On August 6, 2019, the United States Copyright Office denied Southern Field's registration for the Actual CWR. Concurrent with the filing of this second amended complaint, Southern Field is serving notice and a copy of this second amended complaint on the Register of Copyrights.

98.     Killough, or someone acting on behalf of Killough, obtained a copy of the Actual CWR on or about January 24, 2018 in conjunction with Killough's work

for Southern Field, at which time the Actual CWR was stored on Killough's personal computer. Thus, Killough had access to the Actual CWR.

99.     After obtaining a copy of Actual CWR, Killough, or someone acting on behalf of Killough and TMS, copied the Actual CWR or created a substantially similar cost work report for use by TMS in the preparation and submission of bids for industrial maintenance projects.

100.   Through sworn testimony, Killough admits that a comparison of the Actual CWR to a number of Killough and TMS's cost work reports reveals that portions of these TMS cost work reports were copied entirely from Southern Field's Actual CWR.

101.   Through sworn testimony, an agent and/or employee of TMS has admitted that a portion of a number of Killough and TMS's cost work reports were copied or derived directly from the Actual CWR.

102.   Accordingly, a number of Killough and TMS's cost work report are substantially similar to the Actual CWR.

103.   Defendants are wrongfully reproducing the Actual CWR.

104.   Defendants have wrongfully reproduced the Actual CWR or have wrongfully prepared derivative works based on the Actual CWR in, at least, 2018.

105.   Southern Field has been injured by Defendants' acts of infringement.

106.   Defendants have unlawfully and wrongfully derived, and will continue to derive, income and profits from their infringing acts.

WHEREFORE, Southern Field is entitled to and demands from Defendants Killough and TMS at least its actual damages and any additional profits of these Defendants attributable to infringement under 17 U.S.C. § 504(b). Further, these Defendants continued infringement of the exclusive rights granted to Southern Field by the Copyright Act has caused and continues to cause substantial harm to Southern Field, and Southern Field is entitled to and demands injunctive relief to restrain and prevent additional acts of infringement as provided by 17 U.S.C. § 502(a)

## Count IX – Breach of the Byrd Agreement

107.   Southern Field hereby repeats, realleges and reincorporates the allegations in paragraphs 1- 106.

108.   The non-compete and non-solicitation provisions of the Byrd Agreement were and are in force through a three-year period following the termination of Byrd's employment with Southern Field, or from January 2018 until approximately January 2011.

109.   Byrd breached the non-compete and non-solicitation provisions of the Byrd Agreement by providing advice and assistance to Killough in organizing and promoting TMS.

110.   Byrd breached the non-compete and non-solicitation provisions of the Byrd Agreement by providing advice and assistance to Killough with the knowledge that Killough and TMS had secured business, and were seeking to secure additional business, from Georgia-Pacific Cedar Springs, known by Byrd to be a customer of Southern Field.

111.   Byrd breached the non-compete and non-solicitation provisions of the Byrd Agreement by soliciting job opportunities for TMS, a competitor of Southern Field.

112.   Byrd's breaches of the non-compete and non-solicitation provisions of the Byrd Agreement have caused damage and injury to Southern Field.

113.   Byrd's breaches of the non-compete and non-solicitation provisions of the Byrd Agreement aided and assisted Killough and TMS in forming and operating TMS in competition with Southern Field, resulting in at least the loss to Southern Field of work and income on the GP Project.

WHEREFORE, Southern Field demands compensatory damages from the Defendant Byrd, according to proof at trial, attorneys' fees and costs, injunctive relief prohibiting Defendant Byrd's further breaches of the non-compete and non-solicitation provisions of the Byrd Agreement, and extension of the term of the non-compete and non-solicitation provisions of the Byrd Agreement in kind with the period of time it is found that Defendant Byrd has been in violation of the non-

compete and non-solicitation provisions of the Byrd Agreement, and all such other relief to which Southern Field may show itself entitled in the premises.

## **JURY DEMAND**

Plaintiff Southern Field Maintenance and Fabrication, LLC demands a trial by struck jury of its claims for relief set forth in this Complaint.

Date:  August 30, 2019

/s/ *Jeffrey D. Dyess*
_____
Jeffrey D. Dyess (jdyess@babc.com)
Benn C. Wilson (bcwilson@bradley.com)

Bradley Arant Boult Cummings LLP
1819 Fifth Avenue North
Birmingham, AL  35203-2104
Telephone:  (205) 521-8000
Facsimile:  (205) 521-8800

Attorneys for Plaintiff Southern Field Maintenance and Fabrication, LLC

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 30, 2019:

A) I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Shannon L. Holliday        Michael E. Jones
Wallace D. Mills        Jones & Coots, LLC
Copeland Franco Screws & Gill, P.A.    Post Office Box 367
444 South Perry Street (zip 36104)    Luverne, Alabama 36049
Post Office Box 347
Montgomery, AL 36101-0347

B) and I hereby certify that I have mailed by United States Postal Service Certified Mail the document along with the Section 411(a) Notice to the Register of Copyrights as required under 17 USC § 411(a) and 37 CFR 205.13 to the following non-CM/ECF participants:

Register of Copyrights        Hon. Louis V. Franklin, Sr.
United States Copyright Office      U.S. Attorney for the Middle District
101 Independence Avenue SE      of Alabama
Washington, DC 20559-6000      131 Clayton Street
       Montgomery, AL 36104

U.S. Copyright Office        U.S. Department of Justice
Office of General Counsel       Office of the Attorney General
P.O. Box 70400        Attn: Director of Intellectual Property
Washington, DC 20024-0400     Staff, Civil Division
       950 Pennsylvania Avenue, NW
       Washington, DC 20530

C) And I certify that I am effecting service, with a summons, of the document
to the following via hand delivery in accordance with Rule 4, Fed.R.Civ.P.:

William Lomax Byrd
7700 Brantley Hwy.
Brantley, AL 36009.

*/s/ Jeffrey D. Dyess*
Jeffrey D. Dyess
Attorney for Plaintiff Southern Field
Maintenance and Fabrication, LLC